2007 ND 140

J.P., a minor child, Petitioner and Appellant,

v.

STARK COUNTY SOCIAL SERVICES BOARD and the North Dakota Department of Human Services, Respondents and Appellees.

No. 20070004.

Supreme Court of North Dakota.

Aug. 22, 2007.

Bradley D. Peterson (argued) and Edward B. Reinhardt (appeared), Legal Services of N.D., Bismarck, N.D., for petitioner and appellant.

Jean R. Mullen, Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for respondents and appellees.

Todd E. Zimmerman (on brief) and Matthew A. Kipp (on brief), Dorsey & Whitney, Fargo, ND for amicus curiae Fairview Health Services.

SANDSTROM, Justice.

[¶ 1] J.P. appeals a district court judgment affirming a Department of Human Services' order denying medicaid payment for out-of-state medical care. We affirm, concluding the Department's decision is supported by a preponderance of the evidence and the Department is not estopped from denying payment for the out-of-state care.

I

[¶ 2] J.P. and his mother are medicaid recipients receiving medicaid benefits through Stark County Social Services. J.P. was born at St. Joseph Hospital in Dickinson, North Dakota, in 2005. At the time of his birth, J.P. had a severe cleft lip and palate; ear abnormalities; thrombocytopenia, low blood platelets with the potential for increased bleeding and decreased ability to clot; polycythemia, too many red blood cells, which may result in the blood being abnormally thick; he had not gained weight normally intrauterine and was smaller than average; there were concerns about his ability to feed because of his cleft lip and palate; and his bilirubin levels were elevated and increasing. Brian O'Hara, M.D., J.P.'s pediatrician, thought the child may have a metabolic condition or a genetic disorder and decided the child needed to be seen by a metabolic specialist and a genetic specialist as soon as possible.

Dr. O'Hara was aware that a genetic specialist was not immediately available in North Dakota, and there are not any metabolic specialists in the state. He decided J.P. should be transferred to Fairview University Medical Center in Minneapolis, Minnesota, to receive more specialized care and to be evaluated by genetic and metabolic specialists. Dr. O'Hara did not seek prior approval from the Department for medicaid payment of out-of-state medical services. J.P. was transferred to Fairview by air ambulance two days after his birth and was admitted to the neonatal intensive care unit. He was discharged six days later.

[¶ 3] In January 2006, Dr. O'Hara sent the Department a letter requesting medicaid payment for J.P.'s referral to Fairview and explaining why he had transferred the child out of state. The Department denied the request for payment, finding the care provided was available within the state of North Dakota and therefore it was not medically necessary to transfer J.P. to Fairview. J.P. appealed the Department's decision.

[¶ 4] At an administrative hearing, Dr. O'Hara testified about the medical problems J.P. had at birth and that he transferred the child to Fairview because the care J.P. required was not available in state. Gary Betting, M.D., a medical consultant for the Department, testified he did not believe J.P. needed to be transferred to Fairview for treatment because the care J.P. required was available in state. There was also testimony from Kristine Bruhn, a peer denial specialist at Fairview, and Dan Johnson, a Department employee in charge of approving out-of-state referrals, about correspondence and telephone conversations between the Department and Fairview regarding medicaid

payment for J.P.'s care. The administrative law judge recommended the Department affirm the decision to deny medicaid payment for the care J.P. received while at Fairview because the medical care he required was available in North Dakota.

[¶ 5] The Department adopted the administrative law judge's findings and affirmed the decision to deny medicaid payment for J.P.'s out-of-state medical care. J.P. appealed to the district court, which affirmed the Department's decision.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 28–32–42. J.P.'s appeal to this Court is timely under N.D.C.C. § 28–32–49 and N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–32–49.

## II

[¶ 7] Rule 28(b), N.D.R.App.P., governs the format and content of an appellant's brief, and requires a statement of issues presented for review. We have said:

> At a minimum, a brief must contain a statement of the issues presented for review; a statement of the facts and, where those facts are disputed, references to the evidentiary record supporting the appellant's statement of the facts; and the appellant's legal argument, including the authorities on which the appellant relies.

*State v. Noack*, 2007 ND 82, ¶ 9, 732 N.W.2d 389. If a brief does not include at least the minimum requirements, we may dismiss the appeal because the case is not properly before us. *Id.* at ¶¶ 9–10.

[¶ 8] J.P.'s appellant's brief does not contain a statement of the issues. Although we will not dismiss J.P.'s appeal, we caution the parties to comply with all the requirements for appellate briefs in future cases or expect dismissal.

## III

[¶ 9] " 'When a decision of an administrative agency is appealed from the district court to this Court, we review the decision of the agency.' " *Martin v. Stutsman County Soc. Servs.*, 2005 ND 117, ¶ 8, 698 N.W.2d 278 (quoting *Steen v. North Dakota Dep't of Human Servs.*, 1997 ND 52, ¶ 7, 562 N.W.2d 83). Under N.D.C.C. § 28–32–49, we review an administrative agency's decision in the same manner as the district court, and therefore we must affirm the agency's decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of [Chapter 28–32] have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

N.D.C.C. § 28–32–46. Our review of an agency's decision is limited; we will not make independent findings of fact or sub-

stitute our judgment for that of the agency and will only reverse if the agency's findings are not supported by a preponderance of the evidence. *Gustafson v. North Dakota Dep't of Human Servs.*, 2006 ND 75, ¶ 6, 712 N.W.2d 599. We must decide "whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979). Questions of law are fully reviewable. *Gustafson*, at ¶ 6.

## A

[¶ 10] J.P. argues the Department's findings are not supported by the evidence. He claims there is a presumption the treating physician's opinion is correct, and in this case the treating physician, Dr. O'Hara, decided the child needed to be seen by a genetic specialist who does newborn consultations and by a metabolic specialist, neither of which are available in North Dakota. J.P. argues the out-of-state medical care he received should be paid for by medicaid under N.D. Admin. Code § 75–02–02–13(3)(e) because there was good cause for not getting prior approval, the care was medically necessary, and the care was not available in North Dakota.

[¶ 11] The Department places limits on medicaid payments for out-of-state medical care:

2. Except as provided in subsection 3, no payment for out-of-state care, including related travel expenses, will be made unless:

a. The medical assistance recipient was first seen by that recipient's primary physician;

b. The primary physician determines that it is advisable to refer the recipient for care or services which the primary physician is unable to render;

c. A request for active treatment is first made to a specialist;

d. The specialist concludes that the patient should be referred to an appropriate out-of-state provider because necessary care or services are unavailable in the state;

e. The primary physician or specialist submits, to the department, a written request that includes medical and other pertinent information, including the report of the specialist that documents the specialist's conclusion that the out-of-state referral is medically necessary;

f. The department determines that necessary care and services are unavailable in the state and approves referral on that basis; and

g. The claim for payment is otherwise allowable and verifies that the department approved the referral for out-of-state care.

3. a. A referral for emergency care, including related travel expenses, to an out-of-state provider can be made by the primary physician. A determination that the emergency requires out-of-state care may be made at the primary physician's discretion, but is subject to review by the department. Claims for payment for such emergency services must identify the referring physician and document the emergency.

. . . .

e. If a recipient is referred for out-of-state care without first securing approval under subsection 2, and the care is not otherwise allowable under this subsection, the department may approve payment upon receipt of a written request, from the primary physician or specialist, that:

(1) Demonstrates good cause for not first securing approval under subsection 2;

(2) Clearly establishes that the care and services were unavailable in the state; and

(3) Documents that the care and services were medically necessary.

N.D. Admin. Code § 75–02–02–13.

[¶ 12]   Dr. O'Hara testified J.P.'s overall medical condition and its complexity led to the decision to transfer the child to a medical facility out of state.   He testified his main concern was that J.P. may have a metabolic condition, and some metabolic conditions may be lethal or cause serious harm if left unchecked.   Dr. O'Hara testified a metabolic specialist was required to evaluate whether J.P. had a metabolic condition and there are not any metabolic specialists in North Dakota.   He testified he was concerned there was something wrong with J.P.'s bone marrow because his blood was thick and his platelets were low. Dr. O'Hara testified he believed J.P. needed to be evaluated by a genetic specialist immediately because in some instances a child may appear healthy when there is a serious condition, and a genetic evaluation is recommended when a child has three congenital anomalies or a combination of two major and two minor congenital anomalies.   Dr. O'Hara also testified he was concerned with the cleft lip and palate because J.P. had to be fed intravenously through a central line and that may have caused bleeding and other related problems because of the child's thick blood and low platelets.   He also testified he was not aware J.P. was a medicaid recipient, and therefore he did not know he needed to get prior approval for out-of-state care.

[¶ 13]   Dr. Betting testified he reviewed the information in J.P.'s medical records and concluded the requirements for payment of out-of-state medical care were not met.   He testified J.P.'s medical condition was stable when he was transferred to Fairview, there was not an emergency, and a neonatologist in Bismarck or Fargo could have addressed the child's immediate medical needs and could have performed the required medical tests.   Dr. Betting was questioned about Dr. O'Hara's decision to send J.P. to Fairview on the basis of his belief the child's condition could deteriorate and the child needed to be evaluated immediately by genetic and metabolic specialists:

Ms. Mullen: Dr. Betting, you heard Dr. O'Hara's testimony.   And I, I don't know whether you agree with his characterization.   But I, in listening to him, it appeared that he was, he had a[sic] overall concern about everything.   It wasn't just the individual parts.   When you look at the baby as a whole, he appeared to feel that he couldn't deal with it or that Dickinson couldn't deal with it.   Do you think that there's any place in State when you look at the baby as a whole that could deal with the various concerns he had, the metabolic consult, the genetic consult he wanted, the, the pediat, the hematologist on the blood, looking at the cleft palate, could all of that been, have been done in, in state in a safe and timely way?

Dr. Betting: Yes. All those, all of the necessary evaluations could have been done in state by one of our neonatologists.   And they could have consulted their own specialists.   Overall, there was no emergency condition at the time.   The baby was stable.   His respiratory rate was good.   His pulse was good.   His heart and lungs, as far as the major systems in his body, they were all stable. He wasn't even on oxygen.   He had an IV running which was giving him some sugar water ba-

sically. And they had a tube into his stomach to feed him because they didn't want him to aspirate because of the cleft palate. The cleft palate itself isn't really an issue because nobody was going to do anything about that at all for at least ten weeks so that's not any consideration as far as being part of an emergency. You know, he, go ahead ...

Ms. Mullen: I was going to say so the other issues then he was concerned about the genetic consult, the metabolic consult, and the, I guess the blood, looking at the blood which I, I believe is a hematologist?

Dr. Betting: Yes.

Ms. Mullen: Okay. But those would be the other three consults that were considered necessary and, and he believed apparently were an emergency?

Dr. Betting: Well, there's, if he would have sent the baby to the neonatologist here in Bismarck or in Fargo, both places have pediatric hematologists which would have addressed the questions about the baby's hematocrit, that was the increased number of red blood cells and his decreased number of platelets, the thrombocytopenia. The other consults, the genetics consult, would be to see if the total number of, of physical problems that [J.P.] had with the cleft lip, the cleft palate, the skin tags close to the ears if all of those things together represented some named syndrome which would help in predicting the course that, that would have to be taken with him. If, if they could put a name to it, then they can predict what's going to happen and have a lot better idea what's going on. Subsequently when he was seen by the geneticist at [Fairview], at the geneticist at [Fairview], they said all of his dysmorphisms, the, the ab-

normal physical features, did not meet the criteria for any single syndrome. He just had cleft lip/cleft palate, and the skin tags which were dysmorphisms on their own. I mean, they weren't part of a syndrome. The reason for doing the genetic consult at all is to see if he fits that syndrome so they can make a prognosis. And it could be necessary to do it right away if the baby's not stable. That is, if there's something going on and he's really sick and they have to figure out why. Then the geneticist might need to be consulted to, to see if they could help him. But again, [J.P.] was stable.

Dr. Betting testified J.P. would need to see a genetic specialist at some point in the future because some of his abnormal physical features could represent some named syndrome and a specialist could diagnose the syndrome and decide on a course of treatment, but a genetic consult was not needed immediately because the child was stable and there was not an emergency. He testified there is a genetic specialist in Grand Forks who could provide that care. Dr. Betting also testified J.P. did not need to see a metabolic specialist and he could be evaluated in North Dakota because none of the problems identified were emergent, although some of the problems could require treatment in the future that may not be available in state.

[¶ 14] The Department considered whether J.P.'s medical expenses should be covered by medicaid under N.D. Admin. Code § 75–02–02–13 and made findings about the care he received. Because Dr. O'Hara did not receive prior approval for J.P.'s out-of-state medical care, the Department applied N.D. Admin. Code § 75–02–02–13(3) to decide whether there was coverage. The Department found J.P. was in stable condition when he was trans-

ferred to Fairview and there was not an emergency. The Department found the main reason Dr. O'Hara sent J.P. to Fairview was a concern about metabolic or genetic problems, and Dr. O'Hara believed a metabolic specialist and a genetic specialist were not immediately available in North Dakota. The Department found all the tests and medical care J.P. received at Fairview could have been provided in state at a neonatal intensive care unit in either Bismarck or Fargo, and if further problems were found or a situation arose that could not be treated in state, J.P. could have been transferred to another specialist at that time. The Department found "[t]he preponderance of the evidence establishes that [J.P.] required care, perhaps even emergency care, at a medical facility with a neonatal intensive care unit. However, that care was available in Bismarck or Fargo, and it was not medically necessary to transfer [J.P.] for medical care out of state."

[¶ 15] Medicaid may pay for out-of-state medical expenses under N.D. Admin. Code § 75–02–02–13(3)(e) only if there is good cause for not securing prior approval, the care and services are not available in North Dakota, and the care and services are medically necessary. The Department reasonably found J.P. failed to demonstrate there was good cause for not having secured prior approval of the out-of-state care. Although J.P. argues and the Department found that Dr. O'Hara was not aware J.P. was a medicaid recipient, that finding does not establish good cause. The Department found the hospital's records clearly stated J.P. was a medicaid recipient. Dr. O'Hara decided to send J.P. to Fairview for care after having the child in his care for more than twenty-four hours. J.P. was in stable condition, and there was no indication that his condition was deteriorating. The Department found the medical care and services J.P. received

at Fairview were available in North Dakota, and the preponderance of the evidence supports this finding. Dr. O'Hara testified the child was in stable condition when he was transferred to Fairview. Dr. Betting testified there was not an emergency, and the care J.P. required was available at a neonatal intensive care unit in state. We conclude a reasoning mind reasonably could decide the weight of the evidence in the record supports the agency's finding that the requirements for payment of out-of-state medical expenses under N.D. Admin. Code § 75–02–02–13(3)(e) were not met.

■ [¶ 16] Further, even if the Department found all three requirements of N.D. Admin. Code § 75–02–02–13(3)(e) had been met, the regulation states "the department *may* approve payment...." (Emphasis added). When the word "may" is used in a statute, it is generally used to imply discretionary or optional conduct. *Hagel v. Hagel,* 2006 ND 181, ¶ 7, 721 N.W.2d 1. When a recipient is not referred for emergency care and prior approval is not sought, payment for out-of-state care is discretionary.

[¶ 17] J.P.'s remaining arguments on this issue do not affect the outcome of the case, and therefore we need not address them.

### B

■ [¶ 18] J.P. argues the Department is estopped from denying Fairview's claim for payment because Dan Johnson, a departmental employee in charge of approving out-of-state referrals, verbally approved payment and Fairview relied on that approval. The Department claims J.P. failed to raise this issue below and cannot raise it for the first time on appeal.

[¶ 19] At the administrative hearing, Johnson and Kristine Bruhn, a denial spe-

cialist at Fairview Hospital, testified about their correspondence and phone contact regarding payment for J.P.'s medical care. Bruhn testified she faxed Johnson a copy of J.P.'s medical records as soon as J.P. was admitted to Fairview, and followed with a second fax days later, but she did not have an opportunity to speak with him about payment of J.P.'s care until two days after J.P. had been discharged. She testified she believed Johnson verbally approved payment on that date. The Department objected to Bruhn's testimony, arguing it was not relevant. J.P. argued it was relevant because the State would be estopped from denying payment if Johnson verbally approved payment. The administrative law judge allowed the testimony, stating she did not know whether it was relevant. Johnson testified he gave no approval. The Department found "perhaps the fairest interpretation" of the testimony is "there was a misunderstanding during [the] conversation" between Bruhn and Johnson. The Department concluded the possible verbal approval was not a deciding factor in the case. Whether the Department is estopped from denying payment arguably was sufficiently raised below, and therefore we will address the issue on appeal.

[¶ 20] Section 31-11-06, N.D.C.C., authorizes estoppel by declaration, act, or omission:

> When a party, by that party's own declaration, act, or omission, intentionally and deliberately has led another to believe a particular thing true and to act upon such belief, that party shall not be permitted to falsify it in any litigation arising out of such declaration, act, or omission.

To prove a claim of equitable estoppel, the plaintiff must show: (1) the defendant falsely represented or concealed material facts, or calculated to convey the impression that the facts are otherwise than those which the defendant attempted to assert; (2) the defendant intended, or at least expected, that such conduct would be acted upon by, or would influence, the plaintiff; and (3) the defendant had knowledge of the real facts. *Tarnavsky v. Tarnavsky*, 2003 ND 110, ¶ 10, 666 N.W.2d 444. The plaintiff must also show: (1) he lacked knowledge and the means of knowledge of the truth as to the facts in question; (2) he relied, in good faith, upon the conduct or statements of the defendant; and (3) he acted or failed to act on the basis of his reliance, so as to change his position or status, to his injury, detriment, or prejudice. *Id.* Estoppel against the government is available in limited circumstances and should be applied "on a case-by-case basis with a careful weighing of the inequities that would result if the doctrine is *not* applied versus the public interest at stake and the resulting harm to that interest if the doctrine *is* applied." *Blocker Drilling Canada, Ltd. v. Conrad*, 354 N.W.2d 912, 920 (N.D.1984).

[¶ 21] To successfully claim estoppel, J.P. must have shown that he relied on the Department's conduct or statements and that he acted or failed to act as a result. *Tarnavsky*, 2003 ND 110, ¶ 10, 666 N.W.2d 444. J.P. presented evidence that a Fairview representative believed she had secured verbal approval for payment of J.P.'s medical care two days after J.P. was discharged from Fairview. The testimony of Fairview's representative reflects that it did not receive any type of approval while it was providing J.P.'s care, and J.P. had already been discharged when Fairview claims the Department approved payment. J.P. failed to show detrimental reliance on the Department's conduct or statements. J.P. failed to establish the basic elements of estoppel.

IV

[¶ 22]   We affirm the judgment.

[¶ 23] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.